1  John H. Weston, Esq. (SBN: 46146)
   johnhweston@wgdlaw.com
2  G. Randall Garrou, Esq. (SBN 74442)
   randygarrou@wgdlaw.com
3  WESTON, GARROU, WALTERS & MOONEY
   12121 Wilshire Boulevard, Suite 900
4  Los Angeles, CA 90025-1176
   Telephone:  (310) 442-0072
5  Facsimile:   (310) 442-0899

6  Marc J. Randazza, Esq. (Pro Hac Vice)
   Florida Bar No. 625566
7  Massachusetts Bar No. 651477
   mrandazza@firstamendment.com
8  WESTON, GARROU, WALTERS & MOONEY
   781 Douglas Avenue
9  Altamonte Springs, Florida 32714
   Telephone: (407) 975-9150
10 Facsimile: (407) 774-6151

11 Attorneys for Plaintiff

12            **UNITED STATES DISTRICT COURT**

13            **CENTRAL DISTRICT OF CALIFORNIA**

14

15 SOLID HOST, NL                    ) Case No. **CV 08-5414 MMM (Ex)**
                                     )
16            Plaintiff,             ) **PLAINTIFF'S MEMORANDUM IN**
                                     ) **OPPOSITION TO MOTION FOR**
17                                   ) **JUDGMENT ON THE PLEADINGS**
       v.                            ) **BY DEFENDANTS ENOM AND**
18                                   ) **DEMAND MEDIA**
19 NAMECHEAP, INC., etc., *et al.,*  )
                                     )
20            Defendants.            ) **Hrg. Date:** June 15, 2009
                                     ) **Hrg. Time:** 10:00 am
21 ——————————————————————————————     **Judge:** Margaret M. Morrow

22

23

24

25

26

27

28

PRG7244.DOC

# TABLE OF CONTENTS

**Page**

MEMORANDUM IN OPPOSITION ....................................................................1

INTRODUCTION ................................................................................................1

I.  ENOM'S ASSERTION THAT ITS EXCULPATORY RELEASES
    ENTITLE IT TO JUDGMENT ON THE PLEADINGS ON
    PLAINTIFF'S CONVERSION AND INTENTIONAL INTER-
    FERENCE CLAIMS IS ENTIRELY WITHOUT MERIT AS THE
    RELEASES IN ITS CLICK AGREEMENT ARE INAPPLICABLE BY
    THEIR EXPRESS TERMS, AND, IN ANY EVENT, CONSTITUTE
    BOTH SUBTANTIVELY UNCONSCIONABLE PROVISIONS IN A
    CONTRACT OF ADHESION, AND ONES AGAINST PUBLIC
    POLICY, EITHER OF WHICH CAUSE THEM TO BE
    UNENFORCEABLE UNDER WELL-SETTLED WASHINGTON
    LAW ........................................................................................................4

    A.  The relevant facts alleged in the SAC...................................................4

    B.  By its *express terms*, eNom's "limitation of liability" provision is
        inapplicable to plaintiff's conversion and intentional interference
        claims. ....................................................................................................5

        1.  Provision 1 is clearly inapplicable...............................................8

        2.  Provision 2 is also clearly inapplicable. .....................................8

    C.  Under Washington law, eNom's exculpatory release provisions
        are also unenforceable here because, as construed by eNom, they
        are invalid as unconscionable waivers of intentional torts, and
        also because they independently violate public policy.......................10

        1.  eNom's exculpatory release provisions are unconscionable
            and invalid as a matter of law as asserted here to bar
            liability for *intentional* torts......................................................11

            a.  Overview of Washington law on unconscionability. ......11

PRG7244.DOC

b. As applied here to assertedly bar intentional torts, eNom's exculpatory release provisions are unconscionable and invalid ..............................................12

2. In any event, eNom's exculpatory releases are also invalid because they violate public policy, failing *all six* of the "public policy" factors cited in the lead *Wagenblast* case. ......14

a. eNom's exculpatory releases concern a business of a type generally thought suitable for public regulation. ...16

b. The party seeking exculpation is engaged in performing a service of great importance to the public, which is often a matter of practical necessity for some members of the public. ...................................17

c. eNom holds itself out as willing to perform its domain registration service for any member of the public who seeks it, or at least for any member coming within certain established standards. .................19

d. As a result of the essential nature of domain registration services, in the economic setting of the transaction, the party invoking exculpation possesses a decisive advantage of bargaining strength against any member of the public who seeks its services. .........20

e. In exercising a superior bargaining power, eNom confronts the public with a standardized adhesion contract of exculpation, and makes no provision whereby a purchaser may pay additional reasonable fees and obtain protection against negligence................20

f. As a result of the transaction, plaintiff's property was "placed under the control of the seller, subject to the risk of carelessness by the seller or his agents." ............21

3. The cases and arguments cited in eNom's Motion are unavailing to it. ........................................................................22

4. As held in *Kremen*, the mere fact that the problems brought to light here would admittedly be better addressed by legislation, cannot prevent the operation of common law principles to protect innocent tort victims until such time, if ever, as such legislation may be enacted. ..................................25

PRG7244.DOC

iii

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

III    ENOM'S MOTION FOR JUDGMENT ON THE PLEADINGS ON PLAINTIFF'S CLAIM UNDER WASHINGTON'S CONSUMER PROTECTION ACT IS ALSO WITHOUT MERIT....................................26

    A.    The SAC adequately alleges an "unfair" business practice................27

    B.    The SAC adequately alleges a "deceptive" business practice ...........32

    C.    The SAC adequately alleges acts which "affect the public interest" ...........................................................................................322

CONCLUSION....................................................................................34

PRG7244.DOC

iv

# TABLE OF AUTHORITIES

**FEDERAL CASES**

**Page**

*Bazrowx v. Scott*
        136 F.3d 1053 (5th Cir. 1998) .............................................................. 3

*Chalk v. T-Mobile*
        560 F.3d 1087 (9th Cir. 2009) ........................................................... 11

*Helton v. Hawkins*
        12 F.Supp.2d 1276 (D.Ala. 1998) ......................................................... 3

*Jefferson Fourteenth Assoc. v. Wometco de Puerto Rico, Inc.*
        695 F.2d 524 (11th Cir. 1983) ............................................................. 3

*Kremen v. Cohen*
        337 F.3d 1024 (9th Cir. 2003) ...........................................2, 3, 13, 25, 26, 30, 31

*Peoplesoft U.S.A., Inc. v. Softeck, Inc*
        227 F.Supp.2d 1116, (N.D. Cal. 2002) .................................................. 24

*Segal Company (Eastern States, Inc.) v. Amazon.com*
        280 F.Supp.2d 1229 (W.D. Wash. 2003) ............................................... 32

*Wyatt v. City of Boston*
        35 F.3d 13 (1st Cir. 1994) ................................................................... 3

**STATE CASES**

*Adler v. Fred Lind Manor*
        153 Wash.2d 331, 103 P.2d 773 (2005) ............................................11,12,22,23

*Althoff v. System Garages, Inc.*
        59 Wash.2d 860, 371 P.2d 48 (1962), .................................................. 18

*American Nursery Products, Inc. v. Indian Wells Orchards*
        115 Wash.2d 217, 797 P.2d 477 (1990) ............................................. 18, 19

*Aubrey's R.V. Ctr., Inc. v. Tandy Corp.*
        46 Wash. App. 595, 731 P.2d 1124 (1987), .......................................... 32, 33

*In re Marriage of Langham*
        153 Wash.2d 553, 106 P.3d 212 (2005) ............................................. 3, 13, 30

*Puget Sound Financial, L.L.C. v. Unisearch, Inc.*
    146 Wash. 2d 428, 47 P.3d 940 (2002) ........................................................23

*Scott v. Cingular Wireless*
    160 Wash.2d 843, 161 P.3d 1000 (2007) ......................................13, 14, 19, 23

*Scott By and Through Scott v. Pacific West Mountain Resort*
    119 Wash.2d 484, 834 P.2d 6 (1992) .............................................................23

*Tunkl v. Regents of Univ. of Cal.*
    60 Cal.2d 92, 383 P.2d 441, 32 Cal. Rptr. 33 (1963) ......................................15

*Vodopest v. MacGregor*
    128 Wash. 2d 840, 913 P.2d 779 (1996) ...............................................4, 17, 18

*Wagenblast v. Seattle Public School District No. 1*
    110 Wash. 2d 845, 758 P.2d 968 (1988) ......................................14, 15, 21, 23

**FEDERAL STATUTES**

15 U.S.C. § 1114(1)(D)(i) ..............................................................................30

15 U.S.C. § 1114(1)(D)(ii)(II) ........................................................................30

**STATE STATUTES**

RCW § 19.86.020 .........................................................................................26

RCW § 19.86.920 .........................................................................................26

# MEMORANDUM IN OPPOSITION

# I

# INTRODUCTION

The issue raised in defendant eNom's[1] Corrected Motion For Judgment on the Pleadings (hereafter "Motion") is whether the exculpatory release/limitation on liability in its standard registration click agreement[2] bars plaintiff's various damages claims, which, as currently articulated, are based in part on Washington's Consumer Protection Act, and also sound in the common law torts of conversion (SAC Count III) and intentional interference with prospective economic advantage (SAC Count IV).

Defendant eNom, Inc. attempts to paint the claims against it as a "misguided attempt to hold innocent parties liable for the conduct of a wholly independent and unrelated third party."  Motion at 1, lns. 4-6.  However, in so characterizing the damages claims against it, it ignores a key feature of the Second Amended Complaint ("SAC").  The SAC emphasizes eNom's *intentional* acts in refusing to return control

---

[1]   Throughout this Response, the term "eNom" shall be a shorthand reference to both defendant Demand Media, Inc. and its wholly owned subsidiary, eNom, Inc.

[2]   eNom's Motion alleges two such agreements (at pp. 4-5).  The first of the two states that eNom will use "reasonable precautions" to "prevent the unauthorized use or misuse of [its customer's] account identifier or password," but then says that it has absolutely no liability if it *fails* to take reasonable precautions to safeguard a customer's account and domain name information.  (Significantly, plaintiff does not seek redress for eNom's negligence in failing to safeguard plaintiff's account identifier and password.)  It then also incorporates the absolute limiting language of the second provision.

The middle sentence of the second provision (appearing at lines 9-18 of p. 5 of its Motion) is stated as a *total* exculpatory release, but then, the last sentence of that provision states that "in no event shall our . . . maximum aggregate liability exceed the total amount paid by you for registration of the domain name . . . "  Because the first provision and the middle portion of the second provision are stated as *absolute* waivers of liability, allowing a plaintiff no theory by which it could recover even the stated minimal damages, they are described herein throughout as "exculpatory releases" rather than as "limitations of liability."

1

PRG7244.DOC

1  to plaintiff of its domain after having been presented with "facts sufficient to make a

2  reasonable person conclude that eNom was in possession and control of a stolen

3  domain."  SAC, ¶ 142.[3]

4       In other words, the SAC does not seek to make eNom liable for *Doe's*

5  wrongful actions, but only for eNom's *own* culpable conduct.

6       Finally, the most conspicuous thing about eNom's Motion is what is *not* in it.

7  Specifically, at no point does eNom expressly dispute the main legal premise of the

8  complaint against it, *i.e.,* whether its acts constituted either conversion or intentional

9  interference with prospective economic advantage, under Washington law.  Nor does

10  eNom address any issues of asserted negligence on its behalf.  Accordingly, for

11  purposes of the pending Motion, eNom assumes, *arguendo,* that it may have

12  committed these tortious acts, but that it has total immunity to do so granted by its

13  exculpatory release provisions.  Because the issue of whether eNom's actions meet

14  the elements of these torts is not raised in eNom's motion, it is similarly not

15  addressed in any depth in this response.[4]  Plaintiff affirmatively requests that the

16  _____

17       [3]  Even to the extent that the SAC may implicitly support a negligence claim (although none
18  has yet been expressly alleged), any such claim would likewise necessarily be based on some
    asserted fault on eNom's part.  The SAC currently has a number of allegations of eNom's
19  negligence, but no separately stated negligence claim.

20       For example at SAC ¶ 47 plaintiff alleges that eNom was "negligent or grossly negligent"
    because, as alleged in ¶ 49, it "should have had procedures in place to prevent transfers to it of
21  existing registration accounts from either its own accounts or from accounts held by other
    registrars, without first phoning or otherwise contacting the previously known and registered owner
22  of a domain and confirming that the transfer is not fraudulent"  At SAC ¶ 50, plaintiff alleged that
    "even [if] eNom need not employ such procedures in *all* cases, it was certainly negligent in failing
23  to employ such procedures in all cases where the transfer of a pre-existing domain is accomplished
    using a Registered Name Holder which is an anonymity service."  Additionally, at SAC ¶ 149,
24  plaintiff alleged that "[i]n the alternative, eNom and Demand Media have negligently committed
    the common law tort of conversion."  Although negligence is not a required element of the
25  common law tort of conversion, such allegation was nonetheless included in the SAC out of an
    abundance of caution because negligence was present in the principal case of conversion by a
26  registrar on which plaintiff relies, *Kremen v. Cohen,* 337 F.3d 1024 (9th Cir. 2003).

27       [4]  It suffices, at this stage to note that a colorable claim has been made.  Under Washington
    law, "[c]onversion is the unjustified, willful interference with a chattel which deprives a person
28                                                                                      (Continued...)

PRG7244.DOC

2

court refrain from addressing it *sua sponte* as any questions regarding the applicability of such torts would benefit by full briefing by both sides.[5]

In sum, the sole point which plaintiff will address in responding to eNom's Motion for judgment on plaintiff's *tort* claims (as distinct from plaintiff's statutory claims under Washington's Consumer Protection Act) is whether its exculpatory releases apply, by their terms, to the torts described here, and, if so, whether such releases are void under Washington law, either as unconscionable provisions in a contract of adhesion, or in violation of public policy.

---

(...Continued)

entitled to the property of possession." *In re Marriage of Langham,* 153 Wash.2d 553, 564, 106 P.3d 212 (2004). Moreover, "good faith is irrelevant in conversion cases." *Id.* at 566, n. 8. Also, under Washington law, even *intangible* property can be converted, as the court concluded in *Marriage of Langham*, where it held that even stock options were convertible "property" and were deemed converted when exercised. Lastly, *Kremen, supra,* held that where a state's tort law recognizes that conversion may apply to intangible property (as it concluded California's tort law did), the common law tort of conversion applies to a registrar who transfers a domain to one who had no legal right to it.

[5] Plaintiff assumes that defendant may address these issues in a subsequent motion. However, plaintiff is aware that the court retains the inherent power to address purely legal issues affecting the validity of a pleading *sua sponte*. If eNom's exculpatory releases are found *not* to provide it immunity under the particular circumstances of this case, the next most pivotal legal issue will be whether its conduct in fact meets the elements of these common law torts under Washington law. Given the pivotal importance of that analysis to this case, plaintiff requests that the Court refrain from conducting such analysis *sua sponte* and that it not do so until these issues have been squarely presented and fully briefed by the parties.

Nonetheless, should the Court wish to conduct this tort analysis anticipatorily *sua sponte,* plaintiff would request advance notice and a reasonable opportunity to respond with appropriate briefing. *See, e.g., Helton v. Hawkins*, 12 F.Supp.2d 1276 (D.Ala. 1998), holding that "[i]t is within a district court's reserve of power to *sua sponte* dismiss a lawsuit for failure to state a claim upon which relief can be granted . . . 'as long as the procedure employed is fair.' *Bazrowx v. Scott*, 136 F.3d 1053, 1054 (5th Cir. 1998). [Additional citations omitted.] Such fair procedure includes ... notice to all parties of the court's intention to dismiss, a statement of the reasons for the dismissal, and providing the plaintiff with an opportunity to either amend . . . or respond to the basis for dismissal. *See Jefferson Fourteenth Assoc. v. Wometco de Puerto Rico, Inc.,* 695 F.2d 524, 526-27 (11th Cir. 1983); *see also Wyatt v. City of Boston*, 35 F.3d 13, 14-15 (1st Cir. 1994)." *Helton, supra,* 12 F.Supp.2d at 1283. Should the Court wish this issue to be briefed now, plaintiff would request that eNom be ordered to first state any argument it has why these torts could *not* apply here as a matter of law, and then that plaintiff, as the non-moving party, be allowed to respond.

# I

**ENOM'S ASSERTION THAT ITS EXCULPATORY RELEASES ENTITLE IT TO JUDGMENT ON THE PLEADINGS ON PLAINTIFF'S CONVERSION AND INTENTIONAL INTERFERENCE CLAIMS IS ENTIRELY WITHOUT MERIT AS THE RELEASES IN ITS CLICK AGREEMENT ARE INAPPLICABLE BY THEIR EXPRESS TERMS, AND, IN ANY EVENT, CONSTITUTE BOTH SUBTANTIVELY UNCONSCIONABLE PROVISIONS IN A CONTRACT OF ADHESION, AND ONES AGAINST PUBLIC POLICY, EITHER OF WHICH CAUSE THEM TO BE UNENFORCEABLE UNDER WELL-SETTLED WASH-INGTON LAW**

**A.    The relevant facts alleged in the SAC.**

The relevant facts, as alleged in the SAC, are that plaintiff, Solid Host, NL, for several years operated its ongoing web-hosting business through its domain, <SolidHost.com>, which domain it had registered through defendant eNom.  (SAC ¶¶ 13-15.)  On August 4, 2008, a hacker took over control of plaintiff's domain after having illegally obtained access to plaintiff's login and password for its eNom registration account.[6]  (SAC ¶¶ 16-19.)  Thereafter, the hacker employed defendant NameCheap to re-register this domain with eNom under a new account to which plaintiff would have no access, and employed NameCheap's WhoisGuard anonymity service to shield his identity.  (SAC ¶¶ 19-28.)

---

[6]  The SAC alleges that it obtained such access due to negligence by eNom, but plaintiff's damages claims are not based, in whole or even in part, on such pre-theft negligence by eNom.

PRG7244.DOC

4

Following plaintiff's awareness of the theft, and the loss of functionality of its domain, its president, Andre Van Vliet, immediately contacted eNom to report the theft. (SAC ¶¶ 53-55.)  Such call was later followed up by contact between plaintiff's counsel and eNom management, as well as multiple contacts with counsel for eNom, in which plaintiff's counsel explained what had occurred and provided eNom with a sworn declaration of Van Vliet attesting to what had occurred.  (SAC ¶¶ 70-79.)  The SAC alleges that the presentations by plaintiff's owner and its counsel were "sufficient to convince any reasonable person that plaintiff's domain had been stolen by a hacker" (SAC ¶ 72), and were such that they would "make a reasonable person conclude that eNom was in possession and control of a stolen domain."  (SAC ¶ 142.)

Finally, the SAC relates that eNom's management's response was that it refuses to "intervene in such disputes" (SAC ¶ 72) and its lawyers additionally refused a specific and more limited request merely to "at least return functionality" of the domain to plaintiff "pending resolution of the ownership dispute."  (SAC ¶ 77.)

## B.    By its *express terms*, eNom's "limitation of liability" provision is inapplicable to plaintiff's conversion and intentional interference claims.

eNom's sole asserted defense to its failure to return control of this stolen property to plaintiff (even temporarily pending resolution of an ownership dispute), is a contractual defense based on a provision in an asserted "click-agreement" with plaintiff.   Before addressing that defense, plaintiff will summarize what its conversion and intentional interference claims do and do not consist of.

Plaintiff's tort claims are not based either in whole or in part on the fact that, *prior* to the theft of its domain, plaintiff had contracted with eNom to be the registrar of its domain.  Plaintiff's torts claims do not seek damages for any negligence eNom may have committed in allowing the hacker, Doe, to initially obtain plaintiff's login

PRG7244.DOC

and password info (even though plaintiff believes and alleges that such negligence took place).

Rather, the primary basis for these tort claims is eNom's intentional and wrongful conduct *after* the theft had occurred, consisting of refusing to return to plaintiff even temporary control over stolen property *after* being put on notice of facts which would convince any reasonable person that the property had in fact been stolen from plaintiff. In this respect, plaintiff's claims against eNom would have been the same regardless of whether plaintiff had originally hired eNom to be its registrar or, alternatively, had initially used another registrar for its domain, such as Go Daddy or Network Solutions. In short, plaintiff's tort claims have absolutely nothing to do with its preexisting contractual relationship with eNom.

As noted above, eNom's sole asserted defense to plaintiff's tort claims is an inapplicable contractual defense based upon a "limitation of liability" provision present in a "click-agreement" which it claims existed at a point in time, a number of years earlier, when plaintiff initially registered its domain, solidhost.com, with eNom. As plaintiff demonstrates below, this "limitation of liability" provision is entirely inapplicable to the present circumstances *by its express terms*. [7]

_____

[7] For purposes of resolving the legal question of whether eNom's asserted "limitation of liability" provisions apply here, plaintiff will assume, *arguendo*, that such provisions were in fact part of a click-agreement that plaintiff necessarily "clicked on" a number of years ago when it initially registered its domain with eNom. However, should the Court conclude that such provisions, *if* they then existed, would be both enforceable and applicable herein, eNom would then have the burden (either at trial or on summary judgment) of proving their existence in any "click-agreement" actually "clicked on" by plaintiff. However, because it is undisputed that such provisions are *currently* contained in eNom's online "click-agreement" for those seeking its registration services, resolution of the legal issue presented in this motion is indispensable, at a minimum, to resolving plaintiff's claim for prospective injunctive relief under Washington's Consumer Protection Act (SAC Count V).

Accordingly, because demonstrating the invalidity and/or inapplicability of these waivers not only provides an *alternative* basis for defeating eNom's motion as to the tort claims, but is *indispensible* to resolution of a component of plaintiff's claim for prospective *injunctive* relief under the CPA, plaintiff agrees with eNom that the validity and/or applicability of these waiver provisions is ripe for adjudication in the context of the pending Motion.

In its Motion, eNom quotes from two portions of its standard Registration Agreement, a full copy of which was attached to its Answer (Doc. 49) as Exhibit A (Doc. 49-2).  The first portion (hereafter "**Provision 1**") is reproduced at Motion, p. 4, ln. 14 – p. 5, ln. 2, and states:

> "ACCESSING YOUR ACCOUNT AND AN IMPORTANT LIMITATION OF OUR LIABILITY: . . . You agree that any person in possession of you [sic] account login identifier and password will have the ability and your authorization to modify your account and domain name information. . . . You agree that, if we take reasonable precautions in relation thereto, that IN NO EVENT SHALL WE BE LIABLE IF SUCH REASONABLE PRECAUTIONS DO NOT PREVENT THE UNAUTHORIZED USE OR MISUSE OF YOUR ACCOUNT IDENTIFIER OR PASSWORD AND THAT, EVEN IF WE FAIL TO TAKE REASONABLE PRECAUTIONS, THAT OUR LIABILITY UNDER ANY CIRCUMSTANCES SHALL BE LIMITED BY THE LIMITATION OF LIABILITY PROVISION FOUND BELOW IN THIS AGREEMENT."

The second portion of its Registration Agreement upon which eNom's Motion and Answer rely (hereafter "**Provision 2**") is reproduced verbatim as part of the Second and Fourth affirmative defenses in eNom's Answer (Doc. 49) at pp. 16-17 (¶¶ 190 and 197) and states:

> "YOU AGREE THAT WE WILL NOT BE LIABLE FOR ANY . . . (8) LOSS OR LIABILITY RESULTING FROM THE UNAUTHORIZED USE OR MISUSE OF YOUR ACCOUNT IDENTIFIER OR PASSWORD; . . . . YOU ALSO AGREE THAT NEITHER WE NOR YOUR PRIMARY SERVICE PROVIDER WILL BE LIABLE FOR ANY INDIRECT, SPECIAL, INCIDENTAL, OR CONSEQUENTIAL DAMAGES OF ANY

7

KIND (INCLUDING LOST PROFITS) REGARDLESS OF THE FORM OF ACTION WHETHER IN CONTRACT, TORT (INCLUDING NEGLIGENCE), OR OTHERWISE . . . ."  (Ellipses supplied by eNom in its Answer.)

### 1.   Provision 1 is clearly inapplicable.

With respect to Provision 1 above, it is clear that the only limitation which it purports to create on eNom's potential liability is for damages resulting from "the unauthorized use or misuse of [one's] account identifier or password."  Because of this provision, plaintiff did *not* sue eNom herein for any damages occurring as a result of any pre-theft negligence on eNom's part with respect to protecting plaintiff's account identifier or password.

Rather, the type of conduct upon which plaintiff's conversion claim against eNom is based is not related to any alleged mishandling of one of eNom's customers' accounts, but eNom's intentional acts taken *after* Doe wrongfully obtained plaintiff's account login and password info and established its own separate account for the domain, including eNom's refusal to return even temporary control of a stolen domain registered with it by an unrelated third party, even after being presented with facts which would convince any reasonable person that it was in possession or control of a stolen domain.  None of this conduct arises out of eNom's contractual relationship with plaintiff, and nothing in Provision 1 purports to waive liability for that type of conduct.

### 2.   Provision 2 is also clearly inapplicable.

With respect to Provision 2, as plaintiff reads that provision, the scope of conduct for which eNom created its liability limitation is no broader than the type of conduct identified in Provision 1.  While the scope of excluded *damages* identified in Provision 2 appears broader than that in Provision 1, the scope of *activities* covered

8

PRG7244.DOC

by the limitation of liability in Provision 2 seems to be no broader than that covered in Provision 1.

First, clause (8) in Provision 2 *unquestionably* has no application here.  That clause limits liability only "resulting from the unauthorized use or misuse of your account identifier or password."  Since the complaint here does not seek damages for eNom's alleged negligence in allowing Doe to obtain plaintiff's account identifier and password, this clause clearly does not apply here.

Next, the second sentence from the quoted portion of Provision 2 is equally inapplicable here though admittedly somewhat more vague than clause (8) in Provision 2.  Specifically, the second quoted sentence from Provision 2 states that eNom will not be "liable for any indirect, special, incidental, or consequential damages of any kind (including lost profits) regardless of the form of action whether in contract, tort (including negligence) or otherwise," but does not specify the type of conduct by eNom for which this exculpatory release applies.  However, it would be unreasonable to give this provision a sweeping reading divorced from the context of the registration contract.[8]  For example, it would obviously be unreasonable to give this provision a reading which absolved eNom for any negligence action brought against it by one of its registrants if, for example, that registrant happened to be hit by an eNom company car negligently driven by an eNom employee.

Obviously, Provision 2's limitation of liability provision, correctly construed, is limited to any potential liability *arising directly out of eNom's handling of its registrant's account*.  However, the complaint here does not seek to impose any liability on eNom for mishandling plaintiff's account.  Rather, it seeks to impose

---

[8]  It would also violate Washington law in interpreting such provisions.  In *Vodopest v. MacGregor*, 128 Wash. 2d 840, 848-856, 913 P.2d 779, 783-787 (1996), the Washington Supreme Court held:  "Exculpatory clauses in preinjury releases are strictly construed and must be clear if the exemption from liability is to be enforced."

PRG7244.DOC

liability on eNom solely based upon actions it *knowingly* took (or *knowingly* failed to take) *after* an independent third party had obtained control of plaintiff's website and then re-registered it with eNom.  In that respect plaintiff's tort claims are no different than would be the claim of any other victim whose domain was stolen by a hacker and then registered with an unrelated registrar who refused to assist in the return of such stolen property after being presented with convincing proof the property it had registered was in fact stolen.

Equally obviously, neither Provision 1 nor Provision 2 was intended to absolve eNom from liability for *intentional* torts.  Yet, the *only* torts currently claimed here against eNom are intentional torts.[9]  For this reason *alone,* eNom's exculpatory releases are inapplicable and provide no defense to the allegations of the SAC.

For all of the reasons above, the exculpatory releases in eNom's registration agreement do not, on their face, purport to, nor in fact do, act as a bar to plaintiff's actions for conversion or intentional interference.

**C.     Under Washington law, eNom's exculpatory release provisions are also unenforceable here because, as construed by eNom, they are invalid as unconscionable waivers of intentional torts, and also because they independently violate public policy.**

Assuming eNom's exculpatory release provisions are deemed to have the comparatively limited scope which plaintiff attributes to them and not the open-ended scope attributed to them by eNom, plaintiff does not challenge them as being either unconscionable or unenforceable.  However, if they have the broad scope

_____

[9]   Plaintiff does not foreclose the possibility that it may later seek leave to amend to also allege one or more purely negligence-based claims against eNom.  Whether such additional claims are supportable will not be known until completion of further investigation and/or discovery.

PRG7244.DOC

asserted for them here by eNom, the release provisions in its click-agreement are invalid both because they are unconscionable exculpatory releases from liability for future intentional torts, and also because they constitute releases in a contract of adhesion which are of a type that violates public policy under well-established Washington common law.[10]

**1.    eNom's exculpatory release provisions are unconscionable and invalid as a matter of law as asserted here to bar liability for *intentional* torts.**

**a.    Overview of Washington law on unconscionability.**

Preliminarily, and as the court of appeals recently noted in *Chalk v. T-Mobile*, 560 F.3d 1087 (9th Cir. 2009), "unconscionability is a generally applicable contract defense" and "is governed by state law." *Id.* at 1092.  It also observed that where contract provisions are challenged as unconscionable, the cases generally recognize two different types of unconscionability: procedural unconscionability (*e.g.,* if a waiver provision is buried in fine print) and substantive unconscionability.  It noted that some states require proof of both and some only require proof of either one. Washington falls into the latter category, allowing a party challenging a contract term to prevail *solely* with a claim of substantive unconscionability.  *Adler v. Fred Lind Manor*, 153 Wash.2d 331, 346, 103 P.2d 773, 782 (2005).

Plaintiff's unconscionability challenge to the validity of eNom's limitation of liability provisions is based solely on the ground of *substantive* unconscionability. This challenge is distinct from plaintiff's separate attack on those provisions, *infra,* based on public policy.

---

[10]  Plaintiff agrees with eNom's Motion (at p. 10, lns. 5-6) that Washington law governs the validity of any challenged portions of its Registration Agreement, both as to its unconscionability argument and also as to its public policy argument.

PRG7244.DOC

11

Under Washington law, as summarized in *Adler,* "substantive unconscionability involves cases where a clause or term in the contract is alleged to be one-sided or overly harsh." *Id.* at 344, 103 P.2d at 781.  It further noted other terms that are "sometimes used to define substantive unconscionability," including "'shocking to the conscience,' 'monstrously harsh,' and 'exceedingly calloused.'" *Id.* at 344-345, 103 P.2d at 781.  Applying that standard, it found substantively unconscionable multiple aspects of a standard employment agreement, including a provision waiving statutory rights to attorney's fees in arbitration proceedings, as well as a provision imposing a relatively short statute of limitations for bringing any discrimination claims.  The court further noted that a contract, like the one involved in the present case, where the non-drafting party was "not free to negotiate the terms of the agreement" involved "no true equality of bargaining power" and therefore was "an adhesion contract."  153 Wash. 2d at 348, 103 P.3d at 783.  Nonetheless, it concluded that the mere finding that a contract is an adhesion contract does not end the inquiry whether it is unconscionable.  *Id.*

**b.  As applied here to assertedly bar intentional torts, eNom's exculpatory release provisions are unconscionable and invalid**

The torts alleged against eNom in the SAC are *intentional* torts.  Specifically, by definition, the tort of intentional interference with prospective economic advantage (SAC Count IV) is an intentional tort.  Moreover, the tort of conversion, as alleged under the facts in the SAC (SAC Count III), is not only one requiring proof of an intentional act, but, as alleged in this case, is one where the intentional wrongful act was done *knowingly,* i.e., the conversion claim alleges that eNom refused to even temporarily return to plaintiff control over its stolen domain *after*

PRG7244.DOC

1   *having been presented with sufficient facts to convince any reasonable person that*
2   *the domain had in fact been stolen from plaintiff.*[11]

3   Notwithstanding that the torts alleged against eNom in the SAC are *intentional*
4   torts, eNom contends that its limitation of liability provisions not only *apply*, but are
5   neither unconscionable nor violate public policy.  Washington law is clearly to the
6   contrary.

7   Specifically, in *Scott v. Cingular Wireless*, 160 Wash.2d 843, 161 P.3d 1000
8   (2007), the Washington Supreme Court held that a provision in a contract of
9   adhesion which purports to waive or limit liability for intentional wrongful acts is
10  substantively unconscionable.  That case, like this one, involved a standard form
11  contract which there was no ability to revise, causing the court to correctly identify it
12  as a "contract of adhesion."  160 Wash. 2d at 849, 161 P.3d at 1004.  As in *Adler,*
13  *supra,* the court's mere identification of the contract as one "of adhesion" did not end
14  its inquiry into whether it was substantively unconscionable.   The provision
15  challenged in *Scott* was a class action waiver in an arbitration clause for a contract
16  for cellular phone service with Cingular Wireless.

17
18
19
      _____

20   [11]   Paragraph 148 of the SAC alleges that "eNom and Demand Media have committed the
      common law tort of conversion *willfully*, *knowingly, intentionally,* and with a bad-faith intent to
21   profit."  Even though bad faith or wrongful knowledge is *not* a required element of the tort of
      conversion (*see In re Marriage of Langham, supra,* 153 Wash.2d at 566, n. 8), refusing to return
22   even temporary control of the domain *after being put on notice of the true facts*, is a *potentially*
      significant equity in analyzing this conversion claim against eNom.  (*Compare Kremen* where the
23   court of appeals found a registrar liable for conversion, a strict liability offense, but only after first
      noting some fault by the registrar in that case.  In *Kremen* the fault was negligence.  Here the
24   alleged fault is more blameworthy; i.e., the wrongful and knowing failure to return stolen property.)

25   Fault is also alleged in the following paragraph (SAC ¶ 149), where plaintiff alleges:  "In
      the alternative, eNom and Demand Media have negligently committed the common law tort of
26   conversion."  *See also SAC* ¶¶ 47, 49 and 50.  As a matter of clarification, to the extent the SAC
      alleges any *negligence* by eNom, eNom's exculpatory releases are challenged only on the ground
27   that they violate public policy (discussed *infra*), but *not* on the ground of substantive
      unconscionability.

28

PRG7244.DOC

1   *Scott* concluded that the challenged contract provision "functions to exculpate
2   the drafter from liability for a broad range of undefined wrongful conduct, ***including***
3   ***potentially intentional wrongful conduct***," and that "such exculpation clauses are
4   substantively unconscionable."  160 Wash. 2d at 857, 161 P.3d at 1008 (emphasis
5   added).

6   Under the clear holding in *Scott*, eNom's liability waiver provisions constitute
7   substantively unconscionable exculpatory releases to the extent that eNom asserts
8   them here as an absolute bar to liability for any of its *intentional* torts.

9

10  **2.  In any event, eNom's exculpatory releases are also invalid because they**
11  **violate public policy, failing *all six* of the "public policy" factors cited in**
12  **the lead *Wagenblast* case.**

13  Even apart from the fact that eNom's exculpatory releases fail for substantive
14  unconscionability as applied here to exclusively intentional torts, they would
15  independently fail under *Wagenblast v. Seattle Public School District No. 1*, 110
16  Wash. 2d 845, 758 P.2d 968 (1988), the leading Washington case considering the
17  potential invalidity of exculpatory releases on grounds of violating public policy.  In
18  *Wagenblast*, public school students sought the invalidation of school district
19  requirements that they sign limitation of liability forms releasing the district from all
20  future claims for negligence as a condition of their participation in interscholastic
21  athletics.  After initially noting that exculpatory releases for future negligence are not
22  invalid *per se,* the court ruled that the "exculpatory releases" before it were "invalid
23  because they violate public policy."  *Id.* at 848.

24  In arriving at its conclusion, the *Wagenblast* court initially noted, with
25  approval, "appellate decisions in this state [which] have upheld exculpatory
26  agreements where the subject was a toboggan slide, a scuba diving class, mountain
27  climbing instruction, an automobile demolition derby, and ski jumping."  *Id.* at 849
28  (citations omitted).  In contrast to those types of circumstances, the court then cited,

PRG7244.DOC

14

1   with approval, a treatise which had observed that "there are instances where public
2   policy reasons for preserving an obligation of care owed by one person to another
3   outweigh our traditional regard for the freedom to contract." *Id.*

4       In reviewing the prior Washington decisions on this point, the court noted that
5   it "has focused at times on disparity of bargaining power, at times on the importance
6   of the service provided, and at other times on other factors," but that "it is apparent
7   that the court has not always been particularly clear on what rationale it used to
8   decide what type of release was and was not violative of 'public policy'." *Id.* at 851.

9       The court then took the occasion to clarify the criteria which future courts
10  should apply in assessing whether an exculpatory release violates Washington public
11  policy.  It did so by the wholesale adoption of the six part test stated by the California
12  Supreme Court in *Tunkl v. Regents of Univ. of Cal.*, 60 Cal.2d 92, 383 P.2d 441, 32
13  Cal. Rptr. 33 (1963):

14      "Probably the best exposition of the test to be applied in determining
15      whether exculpatory agreements violate public policy is that stated by
16      the California Supreme Court.  In writing for a unanimous court, the late
17      Justice Tobriner outlined the factors in *Tunkl v. Regents of Univ. of Cal.*,
18      60 Cal.2d 92, 383 P.2d 441, 32 Cal. Rptr. 33, 6 A.L.R.3d 693 (1963):

19        "Thus the attempted but invalid exemption involves a transaction
20        which exhibits some or all of the following characteristics.  [1] It
21        concerns a business of a type generally thought suitable for public
22        regulation.   [2] The party seeking exculpation is engaged in
23        performing a service of great importance to the public, which is
24        often a matter of practical necessity for some members of the
25        public.  [3] The party holds himself out as willing to perform this
26        service for any member of the public who seeks it, or at least for
27        any member coming within certain established standards.  [4] As a
28        result of the essential nature of the service, in the economic setting

PRG7244.DOC

15

of the transaction, the party invoking exculpation possesses a decisive advantage of bargaining strength against any member of the public who seeks his services.  [5] In exercising a superior bargaining power the party confronts the public with a standardized adhesion contract of exculpation, and makes no provision whereby a purchaser may pay additional reasonable fees and obtain protection against negligence.  [6] Finally, as a result of the transaction, the person or property of the purchaser is placed under the control of the seller, subject to the risk of carelessness by the seller or his agents."  110 Wash. 2d at 851-852, 758 P.2d at 971 (bracketed numbering added).

*Wagenblast* then observed that an exculpatory agreement need not meet all six of these criteria to be invalid, but that "the more of the foregoing six characteristics that appear in a given exculpatory agreement case, the more likely the agreement is to be declared invalid on public policy grounds." *Id.* at 852.

As the analysis of each of these six factors below will demonstrate, the exculpatory releases upon which eNom rely here violate *all six* of these criteria and are unquestionably void as against public policy under Washington law.

### a.    eNom's exculpatory releases concern a business of a type generally thought suitable for public regulation.

The exculpatory release(s) at issue concern a domain registration business.  As the pleadings make quite clear, such businesses are not only "suitable" for public regulation, but have already been the subject of substantial such regulation.  Specifically, as eNom concedes, the United States Department of Commerce established ICANN for the purpose of establishing uniform regulations and policies for the operation of domain registration businesses.  Without such uniform regulation, the Internet, as a tool of commerce, simply would not work.  Accordingly,

PRG7244.DOC

16

eNom's exculpatory releases unquestionably concern a business of a type generally thought suitable for regulation.

In a subsequent decision, *Vodopest v. MacGregor*, 128 Wash. 2d 840, 856, 913 P.2d 779, 787 (1996), the Washington Supreme Court added that the inquiry under this factor "is not whether the particular endeavor *is* regulated but rather whether it is of a type generally thought *suitable* for public regulation." (Emphasis added.)

**b.    The party seeking exculpation is engaged in performing a service of great importance to the public, which is often a matter of practical necessity for some members of the public.**

eNom, as a domain registrar, is obviously performing a service of vital importance to the public. As the Court may judicially notice, an enormous amount of the world's commerce is conducted via the Internet, and businesses desiring to participate in this commerce require one or more Internet domain through which to operate their businesses. Absent the ability to register a domain with a domain registration company like eNom, no Internet-based business could even *exist*. Consequently, the party seeking exculpation here is "engaged in performing a service" which is not only of "great importance to the public," but one which is often a matter of practical *necessity* for some members of the public, *i.e.,* those conducting Internet businesses or other Internet-based activities.

Moreover, in its subsequent decision in *Vodopest*, *supra,* the Washington Supreme Court further clarified that "[t]he 'practical necessity' language is not construed strictly, and courts have rejected the contention that the service involved must be a 'necessity of life' such as food, housing, or medical care." 128 Wash.2d at 854, n.2, 913 P.2d at 786, n.2.

Neither can eNom successfully argue that releases violate public policy only when the party seeking exculpation is a public entity. Not only need such a party *not*

PRG7244.DOC

1    be a public entity, but, quite to the contrary, the Washington Supreme Court has

2    already *expressly* found that this factor (for finding that a release violates public

3    policy) is met if the party seeking exculpation is a professional bailee like eNom.

4         Specifically, in *Vodopest*, *supra*, the Washington Supreme Court confirmed

5    that an entity need not be a "public entity" in order for its exculpatory clauses to

6    violate public policy, citing with approval a variety of decisions in which

7    Washington courts "have disallowed exculpatory agreements in the landlord-tenant

8    setting, for professional bailments, for common carriers, . . . or for utility

9    companies," most of which are *not* public-owned entities.  *See* 128 Wash. 2d at 849

10   and 860, 913 P.2d at 783 and 789.

11        As if speaking directly to the parties in this case, in *American Nursery*

12   *Products, Inc. v. Indian Wells Orchards,* 115 Wash.2d 217, 797 P.2d 477 (1990), the

13   Court specifically addressed the validity of exculpatory contractual provisions

14   written by *bailees*.  Consistent with a long line of prior Washington decisions

15   (commencing with *Althoff v. System Garages, Inc.,* 59 Wash.2d 860, 864, 371 P.2d

16   48 (1962)), it held that "Washington had adopted the general rule . . . that

17   professional bailees cannot disclaim liability for their own negligence."   115

18   Wash.2d at 231, 797 P.2d at 485.  In contrast, it held that bailment contracts which

19   arise solely out of "a service transaction" do not involve professional bailees and

20   such contracts may contain exculpatory releases without violating public policy.

21        The court defined "professional bailees" as any "persons who make it their

22   principal business to act as bailees and who deal with the public on a uniform rather

23   than on an individual basis."   *Id.*   It gave as examples the "owners of parcel

24   checkrooms, owners of parking places, garagemen, and warehousemen." *Id.*  Other

25   examples also included banks who offer safety deposit boxes and common carriers.

26   115 Wash. 2d at 231, 797 P.2d at 486.  It further explained that the only types of

27   bailees whose exculpatory releases are *not* in violation of public policy are those like

28   the parties there before it where the bailment was part of a service agreement.  In that

case, a large commercial nursery had contracted with a smaller company on an individual basis to grow apple trees from root stocks which were supplied by the larger nursery.  In short, the larger nursery contracted to have the smaller company take its property and then nurture it until it had grown to the point where it would be more salable by the larger nursery, at which point it would be returned to the larger nursery.

In sharp contrast here, eNom solely performs the role of a *professional* bailee; it deals with the public on a uniform rather than on an individual basis; it is charged with the responsibility of safeguarding the bailor's property for so long as it is registered with eNom; and it has no service-related duties to the registrant.  As the court stated in *American Nursery*, "[t]he rule in this state continues to be that professional bailees may not limit their liability for negligence." *Id.* at 231, 797 P.2d at 485.

Finally, as noted above, under Washington law, a bailee may not limit its liability for negligence.  However, it should be emphasized that here, eNom has not only purported to limit its liability for *negligence*, but also to limit its liability for its *intentional* wrongful acts.  Washington law is equally clear that any contractual provision which purports to waive or limit liability for an *intentional* wrongful act not only is unconscionable (under the case law discussed *supra*), but also is invalid because it violates public policy.  *See Scott*, 160 Wash. 2d at 851-857, 161 P.3d, at 1005-1008.

> **c.     eNom holds itself out as willing to perform its domain registration service for any member of the public who seeks it, or at least for any member coming within certain established standards.**

eNom has attached to its Answer its current standard registration agreement. By its terms, this contract is available to any member of the public willing to agree to

PRG7244.DOC

1  its terms.  Consequently, there is no question but that this factor is thoroughly met as

2  well.

3

4  **d.    As a result of the essential nature of domain registration services, in**

5  **the economic setting of the transaction, the party invoking**

6  **exculpation possesses a decisive advantage of bargaining strength**

7  **against any member of the public who seeks its services.**

8      eNom makes much of the fact that plaintiff operates a commercial business

9  and is presumed to be sophisticated and have the ability to negotiate for more

10  acceptable terms.  This, of course, ignores the reality that domain registration

11  services operate exclusively through electronic click-agreements which are not

12  subject to any negotiation whatsoever, no matter how sophisticated the entity seeking

13  registration services.  Consequently, eNom, as the party invoking exculpation here,

14  possesses a decisive advantage of bargaining strength against any member of the

15  public who seeks its services.

16

17  **e.    In exercising a superior bargaining power, eNom confronts the**

18  **public with a standardized adhesion contract of exculpation, and**

19  **makes no provision whereby a purchaser may pay additional**

20  **reasonable fees and obtain protection against negligence.**

21      It is equally clear that the challenged exculpatory release is contained within "a

22  standardized adhesion contract of exculpation," *i.e.,* an electronic click-agreement

23  which operates in a "take it or leave" it fashion.  Moreover, it will be undisputed (and

24  there is certainly nothing before the Court at this time to suggest otherwise) that

25  eNom does not offer, for an additional fee or otherwise, any insurance its customers

26  may purchase to reimburse them in the event eNom acts negligently or willfully in

27  causing them injury.

28

PRG7244.DOC

1    **f.    As a result of the transaction, plaintiff's property was "placed**
2            **under the control of the seller, subject to the risk of carelessness by**
3            **the seller or his agents."**

4    Even the sixth and final factor for analysis under *Wagenblast* is met here.  By

5    registering its domain through eNom, plaintiff's property was placed under the

6    control of eNom.  eNom controlled the DNS settings for plaintiff's domain which

7    were critical to its functionality.  Because those DNS settings could not be changed

8    without eNom's approval and implementation, plaintiff's property was not only

9    placed under the control of eNom, but was subject to the risk of carelessness by

10   eNom or its agents.

11   Application of this sixth and final factor points even more strongly towards the

12   invalidity of eNom's exculpatory release(s) in the specific context in which it is

13   being asserted herein by eNom.  Specifically, under the sixth factor above, eNom's

14   release might well be invalid against public policy even if the SAC sought damages

15   for eNom's *initial* negligence in handling its account and failing to adequately

16   protect its confidential log-in information.[12]

17   However, the fact that eNom is now trying to use this exculpatory release not

18   only to exempt it from liability for its *negligence* in the initial safeguarding of

19   plaintiff's account information, but to exempt it as well for any and all subsequent

20

21   _____

22   [12]   Indeed, it was to ensure that eNom would have no valid policy argument *whatsoever* for
     challenging plaintiff's tort claim(s) against it that led plaintiff to limit its tort claims to eNom's
23   post-theft conduct.  Whatever policy reasons eNom might summon up regarding the standard of
     care which should apply when protecting the confidentiality of plaintiff's account information
24   initially, its limitation of liability provisions could not *possibly* further a valid public policy as
     applied to its post-theft actions, and particularly those in knowingly and intentionally refusing to
25   assist in the return of stolen property within its control after receiving proof that would convince
     any reasonable person a theft had occurred.  Moreover, by limiting its demand even further to
26   require eNom only to *temporarily* return control to plaintiff over the functionality of its domain
     pending ultimate resolution of any ownership dispute, plaintiff further took away any valid public
27   policy argument eNom could make in support of the broad scope claimed for its exculpatory
     release provisions.

28

1  *intentional* tortious conduct it may have engaged in after the theft of plaintiff's

2  domain, shows that there is *absolutely* no public policy which would be served by

3  upholding eNom's exculpatory release in the context of the carefully limited

4  conversion claim asserted herein.  As noted *supra*, it is a well-established principle

5  under Washington law that there is a strong public policy *against* allowing

6  exculpatory releases for intentional acts.

7  For each of these reasons, the existing case law clearly rejects eNom's

8  assertion that its exculpatory releases for all tort claims (including all *intentional* tort

9  claims such as are involved here), are valid and enforceable.

10  **3.    The cases and arguments cited in eNom's Motion are unavailing to it.**

11  Against the wealth of authority supplied above, eNom has supplied little

12  argument.    First, it submitted an entire page of string sites supporting the

13  unremarkable proposition that click-through agreements are not invalid *per se.*  That

14  proposition is entirely without dispute, but has no bearing on the outcome of its

15  motion.  By definition, "click-through" agreements are contracts of adhesion because

16  there is no opportunity for negotiation over their terms.[13]  Nonetheless, plaintiff does

17  not contend (as eNom apparently presumes) that click-through agreements, as

18  contracts of adhesion, are *per se* invalid.  The cases cited herein by plaintiff routinely

19  identify the fact that if a contract is one of adhesion, that is only one factor among

20

21  _____

22  [13]  *See, e.g.*, *Adler,* 152 Wash. 2d at 347-348, 103 P.2d at 782-783.  *Adler* articulated the

23  governing definition of an "adhesion contract" for the state of Washington, and it is clear that the exculpatory releases in eNom's click agreement qualify as classic contracts of adhesion under this

24  test.  Under the *Adler* test, "the following factors . . . determine whether an adhesion contract exists:"

25  "(1)    Whether the contract is a standard form printed contract, (2) whether

26  it was 'prepared by one party and submitted to the other on a "take it or leave it" basis,' and (3) whether there was 'no true equality of bargaining power' between the

27  parties."  153 Wash. 2d at 347, 103 P.3d at 782-783.

28

22

PRG7244.DOC

1  many in evaluating whether it is unconscionable.  *See, e.g., Adler*, 153 Wash.2d at
2  348, 103 P.3d at 783.

3       The only other authorities eNom cites for its position are equally inapplicable
4  and distinguishable.  First, eNom cites *Scott By and Through Scott v. Pacific West*
5  *Mountain Resort*, 119 Wash.2d 484, 492, 834 P.2d 6 (1992) as establishing "'[t]he
6  general rule in Washington . . . that exculpatory clauses are enforceable.'"  Motion at
7  10, lns. 3-4.  Surprisingly, eNom lifted that quotation from a longer sentence which
8  *correctly* states the general rule.  In the original, that sentence said:

9       "The general rule in Washington is that exculpatory clauses are
10      enforceable **unless (1) they violate public policy**, or (2) the negligent
11      act falls greatly below the standard established by law for protection of
12      others, or (3) they are inconspicuous."  *Id.*  (Emphasis added.)

13 Accordingly, rather than establishing a general proposition that exculpatory clauses
14 are enforceable, *Scott* merely states a three-part test for analyzing *whether* they are
15 enforceable.  The "public policy" factor cited by *Scott* was thoroughly analyzed in
16 the subsequent case of *Wagenblast*, cited *supra*, and eNom's agreement clearly fails
17 all six portions of *Wagenblast's* test for evaluating public policy.

18      The next case relied upon by eNom is *Puget Sound Financial, L.L.C. v.*
19 *Unisearch, Inc.*, 146 Wash. 2d 428, 439, 47 P.3d 940 (2002).  That case is correctly
20 cited for the proposition that in a dispute over the conscionability of a liability
21 limitation, the burden is on the party challenging the limitation to demonstrate
22 unconscionability.  However, it contains nothing helpful to eNom to refute the
23 extensive case law cited herein by plaintiffs showing that its exculpatory releases are
24 unconscionable under Washington law.  Moreover, *Puget Sound* expressly
25 recognized that "liability limitations will *not* be enforceable if they are
26 unconscionable" and that [w]hether an exclusionary clause is unconscionable is
27 determined as a matter of law."  146 Wash. 2d at 438, 47 P.3d at 944-945.

28

PRG7244.DOC

1    Lastly, as its sole argument why its exculpatory releases would not be void as

2    against public policy, eNom asserts that both parties to the Registration Agreement

3    are "sophisticated business entities" (Motion at 10, ln. 13), citing *Peoplesoft U.S.A.,*

4    *Inc. v. Softeck, Inc.,* 227 F.Supp.2d 1116, 1120-1121 (N.D.Cal. 2002).  There are a

5    *number* of problems with this citation.  First, it is a federal district court decision

6    applying California law in a case having nothing to do with the state of

7    Washington.[14]  However, an even more important distinction is, once again, provided

8    in a portion of the *same sentence* relied upon by eNom but not supplied to the court.

9    The actual sentence from which eNom derives the "two sophisticated business

10   entities" language is the following:

11       "It is undisputed that the parties – both sophisticated business entities –

12       **freely negotiated the contract**."   227 F.Supp.2d at 1120 (emphasis

13       added).

14   The sophistication of the parties to the agreement is *only* relevant where there

15   is an opportunity for negotiation over the terms of the agreement.  As the cases

16   plaintiff cited *supra* demonstrate, under Washington law, it is irrelevant, in a contract

17   of adhesion, whether both sides are sophisticated business entities. A click-

18   agreement, by definition, allows no negotiation over its terms.

19       For each and all of the reasons above, the exculpatory releases upon which

20   eNom relies, even assuming they would apply under these circumstances, would

21   unquestionably violate every aspect of Washington law for analyzing the validity of

22   such releases.  As a result, eNom's Motion presents no valid grounds challenging

23

24   _____

25

26       [14]  This is not a meaningless distinction.  As noted, *supra,* Washington law allows
     unconscionability to be demonstrated through *either* substantive *or* procedural unconscionability.
27   In contrast, this case holds that California requires there to be proof of "*both* procedural and
     substantive unconscionability."   227 F.Supp 2d at 1120 (emphasis added).

28

PRG7244.DOC

24

plaintiff's conversion and intentional interference claims and is entirely without merit.

**4.    As held in *Kremen*, the mere fact that the problems brought to light here would admittedly be better addressed by legislation, cannot prevent the operation of common law principles to protect innocent tort victims until such time, if ever, as such legislation may be enacted.**

Plaintiff is not unmindful that the Court may be reluctant to take any steps which would significantly undermine any vital aspects of domain name registrations. However, the relief sought here is under very narrow circumstances.  While, as this Court previously noted, true cyber*squatting* (*i.e.,* where one party purchases a previously un-registered domain name confusingly similar to someone else's) is quite common, cases of actual cyber*piracy* (*i.e,* where an already-registered domain is actually stolen) are far more rare.  Rarer yet is a case like this one, where the theft is by an entirely unrelated party having no previous connection with a domain name, and the domain was actively being used by a company over a long period of time as a central component of its ongoing online business enterprise.  Not only are such circumstances far more rare, but the urgency and potential damages in such cases are *far* greater than in a typical cyber*squatting* case.

The existing remedial provisions under ICANN, including optional resort to very lengthy UDRP proceedings, simply provide no effective relief under the narrow types of circumstances presented by this case.  However, the absence of such a remedy in the existing scheme does not justify eNom in turning a blind eye to obvious cases of online theft, at least in those relatively rare cases where the facts can be demonstrated so overwhelmingly[15] and the urgency is both so great and so

---

[15]   Again, plaintiff seeks relief solely because eNom did nothing after being presented with "facts sufficient to make a reasonable person conclude that eNom was in possession and control of a stolen domain."  (SAC ¶ 142.)

1  obvious.   Under such circumstances, the following admonition from the Court of
2  Appeals is instructive:

3        "The district court thought there were "methods better suited to
4        regulate the vagaries of domain names" and left it "to the legislature
5        to fashion an appropriate statutory scheme." *Id.* The legislature, of
6        course, is always free (within constitutional bounds) to refashion the
7        system that courts come up with. But that doesn't mean we should
8        throw up our hands and let private relations degenerate into a free-for-
9        all in the meantime. We apply the common law until the legislature
10       tells us otherwise. And the common law does not stand idle while
11       people give away the property of others." *Kremen*,  337 F.3d at 1036.

12

13                                   **II**

14  **ENOM'S MOTION FOR JUDGMENT ON THE PLEADINGS**
15  **ON    PLAINTIFF'S    CLAIM    UNDER    WASHINGTON'S**
16  **CONSUMER PROTECTION ACT IS ALSO WITHOUT MERIT**

17       Count V of the SAC seeks injunctive relief and damages against eNom under
18  Washington's Consumer Protection Act (CPA), RCW § 19.86.020 *et seq.*   An
19  overview of the scope of that Act was recently provided in *Scott v. Cingular*
20  *Wireless*, 160 Wash. 2d 843, 853, 161 P.3d 1000, 1005-1006 (2007):

21       "The CPA is designed to protect consumers from unfair and deceptive
22       acts and practices in commerce.   RCW 19.86.020.    To achieve this
23       purpose, the legislature requires that the CPA 'be liberally construed
24       that its beneficial purposes may be served.'  RCW 19.86.920."

25                                  * * *

26       "Private actions by private citizens are now an integral part of CPA
27       enforcement.  . . .   Private citizens act as private attorneys general in
28       protecting the public's interest against unfair and deceptive acts and

PRG7244.DOC

26

practices in trade and commerce.   [Citation omitted.]   Consumers bringing actions under the CPA do not merely vindicate their own rights; they represent the public interest and may seek injunctive relief even when the injunction would not directly affect their own private interests."[16]

eNom challenges plaintiff's CPA count by asserting that the SAC does not allege any "unfair" or "deceptive" acts nor any acts which "affect the public interest."  Motion at 11, lns. 13-15.  None of these objections is well-taken.[17]

## A.    The SAC adequately alleges an "unfair" business practice

The SAC adequately alleges sufficient facts to support an allegation of an "unfair" business practice.  The SAC, at ¶ 143, alleges that eNom was in possession of facts such that it should have been able to quickly conclude that it possessed or controlled access to a domain stolen from plaintiff.  SAC ¶ 144 alleges that eNom "should have at least promptly restored functionality of [the] domain to plaintiff pending the ultimate adjudication of ownership of the domain."  Next, SAC ¶ 145 alleges that eNom knew or should have known that plaintiff was suffering enormous damages and irreparable injury for every moment it took to resolve the lawful ownership of its domain.  SAC ¶ 146 states that eNom responded by saying that it would take no action to assist plaintiff absent a court order or a UDRP resolution.

The SAC, at ¶ 146, additionally alleges that eNom "*routinely* takes the position in connection with most or all *similar* claims for restoration of stolen

---

[16]  Applying these standards, *Scott* held that a provision in Cingular Wireless's standard service contract requiring its customers to waive their right to participate in any class action suit against it for its wrongful conduct, was not only unconscionable, but violated Washington's CPA as an unfair business practice.

[17]   eNom's Motion does not dispute that its actions constituted the common law torts of conversion and intentional interference.  Rather, the sole defense asserted to those claims in eNom's current motion is its reliance on the asserted validity of its exculpatory release provisions.

PRG7244.DOC

domains it controls, that it will not restore a stolen domain in its possession or control to one claiming such a theft absent a court order (or . . . UDRP resolution, which . . . takes *months* to obtain), directing it to do so."  (All but last emphasis added.)  All these allegations are incorporated into Count V (the CPA count) by SAC ¶ 156.

The allegations above are sufficient to allege an unfair business practice because, even after eNom is made aware, by convincing proof, that it has registered and controls a stolen domain, it routinely refuses to promptly return control of that stolen property to its rightful owner, even temporarily pending the resolution of any possible ownership dispute.  Such a practice is inherently unfair to those, like plaintiff, who are the wholly innocent victims of a domain theft which eNom facilitated.

Although eNom is not the *only* culpable party here, it is unfair to allow it to take the position that it has no responsibility for the consequences of its own actions. eNom, albeit unknowingly, is the party that unlawfully registered plaintiff's domain to a hacker.  eNom, as registrar, authorized the changed DNS settings that redirected persons looking for plaintiff's domain to find Doe's website instead.

Additionally, not only did eNom commit the tortious act of conversion, but its subsequent knowing and intentional refusal to promptly temporarily undo the damage caused by its unlawful conversion is wholly unfair to the innocent victims of a domain theft which it facilitated.

Additional culpability, and hence "unfairness," is further established by allegations that eNom routinely acts negligently, in that its standard procedures for authorizing domain account transfers are deficient and inadequately protect the valuable rights entrusted to its protection.[18]

---

[18] SAC ¶ 49 alleges that "eNom should have had procedures in place to prevent transfers to it of existing registration accounts from . . . its own accounts . . . , without first phoning or otherwise contacting the previously known and registered owner of a domain and confirming that
(Continued...)

Accordingly, eNom's culpability for an unfair business practice is anchored on three separate factors:  (1) the fact that *it* is the party which accepted re-registration of the stolen domain and changed the DNS settings so one looking for plaintiff's site would not find it; (2) its procedures were insufficiently protective of the rights at stake; and (3) its knowing and intentional refusal, as a business practice, to take any steps to assure a *prompt* return of at least the functionality of a stolen domain in its control.  Neither can eNom respond by saying that it offers the complaining victims of such thefts a realistic or effective remedy.[19]

As evidenced by the dearth of case law on this point, few victims of domain theft will undergo the time and incur the expense of seeking a court order to return

_____

(...Continued)

the transfer is not fraudulent."  SAC ¶ 50 clarified that even if "eNom need not employ such procedures in *all* cases, it was . . . negligent in failing to employ such procedures in all cases where the transfer of a pre-existing domain is accomplished using a Registered Name Holder which is an anonymity service."  At the very least it should require some additional scrutiny where, as here, all of the above factors are present and, in addition, it has evidence that the domain is one previously under its own registration and registered to a different owner.

[19] eNom asserts that an ongoing online business should be content with the sole remedies of either finding counsel to seek judicial relief (a *very* expensive option and one still requiring a few weeks to successfully pursue), or seeking a UDRP resolution.  As shown below, neither of these remedies is adequate where the domain of an *ongoing* online business has actually been *stolen* its rightful owner deprived of ) and time is of the essence.

The UDRP is a *totally* inadequate remedy in thefts of actively used domains because damage in such cases increases by the *hour* (if not the minute) and it takes *months* to get a UDRP adjudication of ownership rights.  SAC ¶ 146.

The remedy of seeking a court order is also totally inadequate due to the amount of time and money involved.  Time-wise, as here, the would-be plaintiff must initially exhaust its potential remedies with the registrar for voluntary return of the domain.  After that process is exhausted, counsel must be found willing and able to drop everything in order to litigate on an emergency basis.  If counsel is found then all relevant legal pleadings must be thought through and prepared, including not only a sufficient complaint, but also all supporting declarations and other documentation, along with the various required ex parte papers (including a potentially quite complicated proposed order) needed to seek a TRO.  Then, to obtain jurisdiction over the defendants, service of all papers must be effectuated on all defendants, which also includes research just to figure out where various nationally or internationally-operating defendants are to be served.

PRG7244.DOC

29

1    their property rather than either giving up or simply paying the ransom demanded for

2    the return of a stolen domain.

3        Because each additional day of loss adds exponentially to the victimized

4    business' damages and loss of good will, forcing a domain theft victim to resort

5    exclusively to one of these two procedures (as eNom did here) is an *inherently* unfair

6    business practice.

7        Moreover, as noted *supra,* 15 U.S.C. § 1114 (1)(D)(i) and 1114 (1)(D)(ii)(II)

8    immunize eNom from any statutory liability to an asserted domain thief if eNom

9    complies with an appropriately supported request for temporary return of a stolen

10   domain, so long as eNom does so pursuant to a reasonable policy for temporary

11   return of domains requiring reasonable proof that the domain has in fact been stolen.

12   Obviously, Congress contemplated and intended that registrars should establish such

13   policies, yet eNom has not done so.

14       Unfairness is also measured by comparing the relative equities of the parties,

15   as was demonstrated in a related context (though admittedly not one arising under

16   Washington's CPA) in *Kremen v. Cohen*, 337 F.3d 1024 (9th Cir. 2003).  In *Kremen*,

17   the Court of Appeals held that a victim of domain theft had adequately alleged a

18   conversion claim against its registrar, even though the far more culpable party was a

19   third party who, like John Doe here, had illegally persuaded the registrar to transfer

20   the victim's domain to its sole control.[20]  In discussing the issue of "fairness" (even

21   though not an element under the conversion tort there alleged), the court noted that

22   the alleged thief, "Cohen[,] is out of the picture" and therefore "[t]he question

23   becomes whether [the registrar] should be open to liability for its decision to hand

24

25

26   [20] Though the Washington courts have not yet addressed this *particular* application of the
     tort of conversion, they clearly apply that tort to the theft of intangible property.  *See*, *e.g.*, *In re*
27   *Marriage of Langham*, 153 Wash.2d 553, 566, 106 P.3d 212 (2005) (analyzing the relevant cases
     and holding that stock options, even though intangible property, may be the subject of conversion).

28

PRG7244.DOC

over [plaintiff's] domain name."  *Id.* at 1035.  The court concluded: "Negligent or not, it was [the registrar] that gave away [plaintiff's] property.  [Plaintiff] never did anything.  It would not be unfair to hold [the registrar] responsible and force *it* to try to recoup its losses by chasing down [the thief]."  *Id.* at 1035.

Here, there is more "unfairness" for which the registrar is responsible than was present in *Kremen.*  Unlike the plaintiff in *Kremen*, plaintiff is additionally seeking recovery for its registrar's *post-theft* willful tort of intentionally refusing to return even *temporary* control of stolen property to prevent irreparable injury, under circumstances where the other potentially affected party, Doe – who did not use the domain to operate any online business – could not possibly have suffered any irreparable injury, and where all signs confirmed that a theft had in fact occurred.

Another significant distinction is that here, unlike in *Kremen,* the theft was of an actively-used domain vital to the operation of an ongoing business, where each additional day of loss caused astronomically greater damages to the plaintiff.  (In *Cohen,* the stolen domain had not yet been put into operation.  This is made clear in the District Court's opinion in that case, *Kremen v. Cohen*, 99 F.Supp.2d 1168, at 1170 (N.D.Cal. 2000).)  Because the stolen domain here, unlike the one in *Kremen,* was that of an active online business, the equities favoring Solid Host are even greater than those favoring *Kremen* as there is even less validity to any assertion that the sole relief should be through the enormously time-consuming UDRP process.

In sum, eNom's routine refusal to return even *temporary* control over domains where it has been presented with evidence sufficient to convince any reasonable person that it has registered a stolen domain, is an unfair business practice rendered actionable under Washington's CPA, and is all the more so in a case like this one where the registrar (as in *Kremen*) was the plaintiff's own bailee who negligently allowed the plaintiff's valuable property to be transferred.

**B.    The SAC adequately alleges a "deceptive" business practice**

The SAC also adequately alleges a "deceptive" business practice (even though proof of an "unfair" business practice, alone, would be sufficient under the statute). At ¶ 53, the SAC alleges that Doe replaced plaintiff's Solid Host webpage with his own which "simply said the name . . . SOLID HOST, and then announced that the domain was for sale."

These facts clearly allege a "deceptive" business practice.  Any member of the public (including all of plaintiff's then-existing customers as well as any potential future customers) who went to that site would naturally be deceived into believing that plaintiff's business was no longer in operation.  This deprived the public of access to plaintiff's business and caused enormous economic damage to plaintiff. Moreover, eNom shares responsibility for this fraud because it was eNom's lack of care in screening transfers and its willful refusal to even *entertain* any requests for temporary return of stolen domains it had registered which facilitated and was critical to the success of this deceptive business practice.  It is also irrelevant that eNom may not have *intended* Doe's hoax to succeed.  "[S]o long as the action has the capacity to deceive a substantial portion of the public[,] intent to deceive need not be shown." *Aubrey's R.V. Ctr., Inc. v. Tandy Corp.*, 46 Wash. App. 595, 609, 731 P.2d 1124, 1132 (1987).

**C.    The SAC adequately alleges acts which "affect the public interest"**

In its Motion, eNom correctly cites the principle that "'in determining whether an act is "deceptive" under the CPA, the court looks . . . to whether the act has the capacity to materially deceive a substantial portion of the public.'"  Motion at p.11, lns. 24-27.  However, of the three cases eNom cites for this proposition, the only one which actually applied it to disqualify a CPA claim was *Segal Company (Eastern States, Inc.) v. Amazon.com*, 280 F.Supp.2d 1229 (W.D.Wash. 2003), where only one party, a subsidiary of the plaintiff, was alleged to have been deceived.  (The plaintiff

PRG7244.DOC

did not allege "that defendant offered the same misrepresentations to anyone other than Sibson." *Id.* at 1233.)  In contrast, here, by rerouting the DNS settings for plaintiff's domain so that the entire Internet-using public would be directed to the hacker's web page rather than plaintiff's, the fraud affected any and every member of the public who might have sought out plaintiff's domain.  That is more than sufficient to qualify under the "substantial portion of the public" requirement under the CPA.

Finally, eNom's last argument under its "public interest" defense is its citation of *Aubrey's R.V. Ctr., Inc., supra,* for the proposition that there is no impact upon the public interest absent facts demonstrating "a generalized course of conduct."  Motion at 12, ln.21.  However, the SAC clearly alleges that eNom's conduct complained of herein was not an isolated act but part of a generalized course of conduct.  *See* SAC ¶ 146, which alleges that eNom "*routinely* takes the position in connection with most or all similar claims for restoration of stolen domains it controls, that it will not, even temporarily, restore a stolen domain in its possession or control to one claiming a theft absent a court order (or other official order resulting from a UDRP resolution, which itself, takes *months* to obtain), directing it to do so."  (Initial emphasis added.)

Also, the lax procedures for confirming ownership in the case of transfers of previously registered domains are likewise "a generalized course of conduct."

Indeed, the *primary goal* of plaintiff's CPA injunctive claim is to cause eNom to effectuate long-term changes in the manner in which it generally does business so that no other businesses will be victimized in the same way plaintiff was here.

PRG7244.DOC

**CONCLUSION**

For the foregoing reasons, eNom's Motion for Judgment on the Pleadings is not well-taken and plaintiff is entitled to establish its claims on summary judgment and/or at trial.

Dated:  May 29, 2009                           John H. Weston
                                               G. Randall Garrou
                                               Marc J. Randazza
                                               **WESTON, GARROU, WALTERS & MOONEY**


                                               **By:** ____**s/**_____
                                               **G. Randall Garrou**
                                               Attorneys for Plaintiff

PRG7244.DOC

34