UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SOLID HOST, NL, <br><br> Plaintiff, <br><br> v. <br><br> NAMECHEAP, INC., a Delaware Corp. d/b/a Namecheap and Whois Guard Protected; DEMAND MEDIA, INC., a Washington Corp. with its principal place of business in Los Angeles, d/b/a eNom, and JOHN DOE 1, <br><br> Defendants. | CASE NO. CV 08-05414 MMM (Ex) <br><br> ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR JUDGMENT ON THE PLEADINGS |

On August 17, 2008, plaintiff Solid Host, NL filed this action against defendants NameCheap, Inc., dba Whois Guard Protected; Demand Media, Inc., dba eNom, Inc.; and John Doe 1.[1] Solid Host alleges that Doe "hijacked" its domain name, <solidhost.com>. On April 21, 2009, eNom filed a motion for judgment on the pleadings.

### I. FACTUAL AND PROCEDURAL BACKGROUND

**A. Technical Background**

This action requires knowledge of certain of the technical aspects of registering domain

---

[1] For convenience, the court refers to NameCheap, dba Whois Guard, as "NameCheap" and to Demand Media, dba eNom, as "eNom."

names for internet web sites. The court will briefly summarize this technical background before outlining the facts of the case.

The location of individual sites on the internet is denoted by an internet protocol ("IP") address composed of a string of four groups of digits separated by periods. Each site has a unique numeric internet address. *Lockheed Martin Corporation v. Network Solutions, Inc.*, 141 F.Supp.2d 648, 650-51 (N.D. Tex. 2001) ("*Lockheed Martin II*"); see also *Smith v. Network Solutions, Inc.*, 135 F.Supp.2d 1159, 1160 (N.D. Ala. 2001). For ease of access, the numeric addresses typically correspond to more easily remembered alphanumeric "domain names" (such as <google.com>), which internet users can enter in their web browser to access specific sites. *Lockheed Martin II,* 141 F.Supp.2d at 650-51; *Smith*, 135 F.Supp.2d at 1160. A domain name is composed of two parts, separated by a period. The portion to the right of the period, i.e., the "com" in <google.com>, is known as the "top level domain" or "TLD." *Smith*, 135 F.Supp.2d at 1160-61; see also *American Girl, LLC v. Nameview, Inc.*, 381 F.Supp.2d 876, 879 (E.D. Wis. 2005). The portion to the left of the period, generally a series of a numbers and letters chosen by the operator of the site, i.e., the "google" in <google.com>, is known as the "second level domain" or "SLD." *Smith*, 135 F.Supp.2d at 1160-61.

One wishing to use a specific domain name must register the name with one of numerous competing companies known as registrars. In 1993, pursuant to a contract with the National Science Foundation, Network Solutions, Inc. ("NSI") became the sole registrar for domain names in the most commonly used TLD's (".com," ".net," ".org," and ".edu"). *Id*. at 1161. In 1998, the federal government adopted a policy favoring competitive domain name registration. "In furtherance of this policy, a private, non-profit corporation, the Internet Corporation for Assigned Names and Numbers ('ICANN'), was formed to assume responsibilities for managing the allocation of Internet Protocol numbers and the domain name system. Also as part of the transition to a competitive system, NSI's domain name registration service was divided into two separate units: a registrar and a registry." *Id*. The registry maintains a centralized, publicly accessible database of information concerning all domain names in a TLD, known as the Whois

1  (or WHOIS) database;² this database is compiled from information submitted by registrars. *Id.*
2  While there is only a single registry for each TLD, there are numerous competing registrars. *Id.*
3  Registrars control the IP addresses associated with particular domain names.³ Customers seeking
4  to register specific domain names interact with registrars; the registrars submit information
5  regarding domain names to the registry, which includes the information in the public Whois
6  database. A registrar must be accredited by ICANN for each TLD in which it operates. As part
7  of the certification process, all registrars must sign the ICANN Registrar Accreditation Agreement
8  (the "ICANN agreement").⁴

9  Generally, an individual seeking to use a domain name submits an online application to a
10 registrar. *Id.* at 1161-62. "[I]f someone submits an application for a particular domain name that
11 already exists in the Registry WHOIS database by virtue of a prior registration, that name cannot
12 be registered again, and the applicant is advised that the sought domain name is unavailable. . . .
13 If there is no existing registration for a given SLD name within a given TLD, [however,] that
14 domain name is considered available and generally may be registered on a first-come, first served
15 basis." *Id.* at 1162. The registrant must provide personal and contact information that becomes
16 part of the Whois database. *American Girl*, 381 F.Supp.2d at 879. The Whois database "allows
17 all registrars to determine almost instantaneously which domain names are already registered and
18 therefore unavailable to others," and "allow[s] a person whose registration application for a
19 particular domain name has been denied as unavailable to determine which registrar registered the
20 name he desires with the Registry." *Smith*, 135 F.Supp.2d at 1160-62.

---

²"Technically, WHOIS is not the database, itself, but a protocol for submitting a query to a database in order to find contact information for the owner of a domain name." Matthew Bierlin & Gregory Smith, *Privacy Year in Review: Growing Problems with Spyware and Phishing, Judicial and Legislative Developments in Internet Governance, and the Impacts on Privacy*, 1 I/S: J. L. & POL'Y FOR INFO. SOC'Y 279, 313 (2005). Because it is common to refer to the "Whois database," however, the court adopts that terminology.

³Second Amended Complaint, ¶ 33.

⁴*Id.*, ¶¶ 29-31.

There has been a growth in "companies that will register domain names for individuals and act as a proxy by using the company's contact information." *Id.* Such services allow domain name registrants concerned with maintaining their privacy to remain anonymous. Naturally, these services also appeal to registrants who wish to conceal their identities for illegitimate purposes.

### B. Allegations in Solid Host's Complaint

#### 1. The Parties

Solid Host is a corporation based in the Netherlands, which is in the business of providing various internet-related services, including web hosting.[5] Defendant eNom is an ICANN-accredited registrar.[6] Defendant NameCheap is also an ICANN-accredited registrar; Solid Host alleges that it "does not currently know whether [NameCheap] may have acted as [a registrar] in connection with the facts of this particular case."[7] In addition to functioning as a registrar, NameCheap offers an anonymity service known as "WhoisGuard," whereby NameCheap becomes the registered owner of a domain name desired by a customer, and licenses the domain name to the customer.[8] As a result, NameCheap's contact information rather than the customer's appears in the Whois database.[9] Defendant Doe is an anonymous individual described by Solid Host as a "hacker."[10]

#### 2. Doe's Hijacking of Solid Host's Domain Name & eNom's Response

Solid Host alleges that it is the owner of the domain name <solidhost.com>.[11] It registered this name through eNom in December 2004, and has used the domain name to conduct

---

[5] Second Amended Complaint, ¶ 6.

[6] *Id.*, ¶¶ 29, 30.

[7] *Id.*, ¶ 31.

[8] *Id.*, ¶¶ 34, 37.

[9] *Id.*

[10] *Id.*, ¶ 16.

[11] *Id.*, ¶ 13.

4

its business since that time.[12]

Solid Host asserts that on Monday, August 4, 2008, due to a "security breach" at eNom, "Doe unlawfully gained access to [Solid Host's] domain registration account," obtained Solid Host's login and password information, and "stole" the domain name <solidhost.com>.[13] According to the complaint, Doe "either by himself, or through his agent, defendant NameCheap . . . moved [Solid Host's] domain name to another domain registration account with . . . eNom."[14] Doe "or NameCheap acting at Doe's direction" altered the IP address associated with <solidhost.com>, so that internet users accessing <solidhost.com> viewed a website "controlled solely by Doe" rather than Solid Host's site.[15] The website stated that the domain name <solidhost.com> was for sale, and provided an email address for inquiries.[16] Solid Host alleges that Doe and NameCheap entered into a contract pursuant to which NameCheap agreed to become the registrant for <solidhost.com> listed in the Whois database and to "license[ ] the domain's operability and functionality back to Doe."[17]  Once the registration for <solidhost.com> was switched to a new account, Solid Host's owner, Andre Van Vliet, could no longer alter the IP address associated with the domain name to re-direct internet traffic to Solid Host's website.[18]

After discovering that he could no longer control the <solidhost.com> web site, Van Vliet attempted to regain access of the domain name.   Van Vliet contacted eNom, but eNom refused

---

[12]*Id.*, ¶¶ 13-14.

[13]*Id.*, ¶ 10, 16-19.

[14]*Id.*, ¶ 19.

[15]*Id.*, ¶¶ 17, 20.

[16]*Id.*, ¶¶ 38, 53.

[17]*Id.*, ¶¶ 25-26.

[18]*Id.*, ¶ 21.

5

to transfer the domain name.[19] Van Vliet then contacted the email address listed on <solidhost.com> and received an offer to sell the domain name for $12,000 from a different email address.[20] Because Doe demanded payment via wire transfer, Van Vliet refused to pay.[21] After negotiations with Doe failed, Van Vliet contacted Solid Host's counsel. Solid Host asserts that its attorney provided eNom's "Director of Compliance" with "evidence. . . that would have been sufficient to convince any reasonable person that [Solid Host's] domain [name] had been stolen by a hacker."[22] eNom stated that it would not intervene in what it viewed as a dispute between Solid Host and Doe.[23] Solid Host's lawyer next spoke with eNom's outside counsel, and requested that eNom transfer the domain back to Solid Host temporarily, pending resolution of the ownership dispute between Solid Host and Doe. eNom's counsel stated that the company would not take action.[24]

Solid Host alleges that "eNom failed to take any reasonable steps to inquire into the bona fides of Doe before it transferred [Solid Host's] account at Doe's (or NameCheap's) request, under circumstances where it knew or should have known that there was a high likelihood that the transfer [might] be fraudulent."[25] It asserts that eNom acted with negligence or gross negligence in failing to institute procedures "to prevent transfers to [eNom] of existing [domain name] registrations. . . without first phoning or otherwise contacting the previously known and registered

---

[19]*Id.*, ¶ 55.

[20]*Id.*, ¶ 58.

[21]*Id.*, ¶ 60.

[22]*Id.*, ¶ 72.

[23]*Id.*

[24]*Id.*, ¶ 76.

[25]*Id.*, ¶ 45.

6

owner of a domain."[26]  Solid Host further contends that eNom "has a policy of not allowing any type of procedure for a reasonably prompt return of stolen domain names."[27]  It asserts that eNom's refusal to transfer the domain name back to Solid Host temporarily after Solid Host provided proof that it had been stolen was unreasonable and evinces "an intention to harm [Solid Host] or a reckless disregard for the harm visited upon [it]."[28]  Solid Host asserts that eNom's refusal to take action "is the standard position eNom always takes in . . . disputes [regarding allegedly stolen domain names]."[29]

### C. Procedural Background

Solid Host filed its initial complaint on August 18, 2008.[30]  On August 21, 2008, it filed an *ex parte* application for temporary restraining order.  The court granted the application on August 26, 2008.[31]  The court directed eNom to transfer <solidhost.com> to Solid Host's control, directed NameCheap to cooperate with eNom, and required it to transfer the domain name to Solid Host if eNom failed to effect a transfer.  That same day, eNom returned control of the domain name to Solid Host.[32]  On September 4, 2008, NameCheap revealed Doe's identity to Solid Host's counsel.[33]  Solid Host has not sought to amend its complaint to substitute this

---

[26]*Id.*, ¶ 49.  Solid Host appears to argue that eNom is liable not only because its security procedures allowed Doe to secure control of Solid Host's domain name, but also because it agreed to open a new account for Doe using that domain name without determining how he had obtained it.  Solid Host appears to contend even had the name been registered in the first instance with a registrar other than eNom, eNom had a duty to inquire when Doe sought to register the name with it.

[27]*Id.* (emphasis removed).

[28]*Id.*, ¶¶ 89, 94.

[29]*Id.*, ¶ 73.

[30]*Id.*, ¶ 95.

[31]*Id.*, ¶ 96.

[32]*Id.*

[33]*Id.*, ¶ 97.

1  individual for the fictitious Doe defendant.

2      The order granting Solid Host's application for temporary restraining order set September
3  4, 2008 as the date for a hearing on an order to show cause why a preliminary injunction should
4  not issue. The parties stipulated to continue this hearing numerous times. Finally, on January
5  7, 2009, the parties stipulated to entry of a preliminary injunction. Solid Host filed an amended
6  complaint on February 20, 2009, and a second amended complaint on February 27, 2009. On
7  April 21, 2009, eNom filed the present motion.

8      The second amended complaint alleges three causes of action against eNom: conversion,
9  intentional interference with prospective economic advantage, and unfair competition in violation
10 of Washington's Consumer Protection Act , Washington Revised Code section 19.86.020 et seq.
11 (the "CPA"). eNom argues that it is entitled to judgment on the pleadings because the domain
12 name registration agreement contained limitation of liability provisions exculpating eNom from
13 liability for the actions that form the basis of Solid Host's complaint. In addition, eNom argues
14 that Solid Host's complaint fails to state a claim under Washington's CPA.

## II. DISCUSSION

### A. Standard Governing Motions for Judgment on the Pleadings

18     Under Rule 12(c) of the Federal Rule of Civil Procedure, any party may move for
19 judgment on the pleadings at any time after the pleadings are closed but within such time as not
20 to delay the trial. FED.R.CIV.PROC. 12(c). "For the purposes of the motion, the allegations of
21 the non-moving party must be accepted as true, while the allegations of the moving party which
22 have been denied are assumed to be false." *Hal Roach Studios, Inc. v. Richard Feiner and Co.,*
23 *Inc.*, 896 F.2d 1542, 1550 (9th Cir. 1990). "Judgment on the pleadings is proper when the
24 moving party clearly establishes on the face of the pleadings that no material issue of fact remains
25 to be resolved and that it is entitled to judgment as a matter of law." *Id*.

26     When filed by a defendant, a motion for judgment on the pleadings is a "means to
27 challenge the sufficiency of the complaint after an answer has been filed." *New.Net, Inc. v.*
28 *Lavasoft*, 356 F.Supp.2d 1090, 1115 (C.D. Cal. 2004). A motion for judgment on the pleadings

is therefore similar to a motion to dismiss. *Id.* ("[Rule 12(c)] is a vehicle for summary adjudication, but the standard is like that of a motion to dismiss," citing *Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984)); see also 2 William W. Schwarzer et al., CALIFORNIA PRACTICE GUIDE: FEDERAL CIVIL PROCEDURE BEFORE TRIAL, § 9:319 at 9-84 (The Rutter Group 2001). "Dismissal is proper only if it appears beyond a doubt that the plaintiff can prove no set of facts in support of its claim which would entitle him to relief." *New.net*, 356 F.Supp.2d at 1115 (citing *Sun Savings & Loan Association v. Dierdorff*, 825 F.2d 187, 191 (9th Cir. 1987)).

In deciding a motion for judgment on the pleadings, the court generally is limited to the pleadings and may not consider extrinsic evidence. See FED.R.CIV.PROC. 12(c) (providing that a Rule 12(c) motion for judgment on the pleadings should be converted into a Rule 56 motion for summary judgment if matters outside the pleadings are considered by the court). A district court may, however, consider documents "whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the pleading." *Branch v. Tunnell*, 14 F.3d 449, 454 (9th Cir. 1994). Moreover, a district court may consider a document if the complaint "necessarily relie[s]" on it, and the authenticity of the document is not challenged. See *Parrino v. FHP, Inc.*, 146 F.3d 699, 706 (9th Cir. 1998).

**B.     Whether the Court Should Consider the Registration Agreement on Which eNom Relies**

eNom alleges that Solid Host entered into a registration agreement with it when eNom registered the <solidhost.com> domain name. The alleged agreement was a "click-through" agreement, i.e., a contract to which an internet user agrees by clicking an "I Accept" button prior to using a company's services online.[34] eNom argues that the court should consider the agreement in ruling on its motion. It asserts that the agreement attached as an exhibit to its answer is the agreement to which Solid Host agreed by clicking the appropriate button. According to eNom, limitation of liability provisions in the agreement immunize it from liability on Solid Host's

---

[34]Defendants Demand Media, Inc. and eNom's Motion for Judgment on the Pleadings ("Mot.") at 8-9.

1 claims. Solid Host's complaint does not allege the existence of this agreement, however. Rather, the agreement is raised in eNom's answer and attached to it as an exhibit. Further, Solid Host disputes that it agreed to the agreement, and that acceptance of a limitation on liability was a condition of registration at the time eNom registered its domain name.[35] Nonetheless, Solid Host asks to court to decide whether the agreement would be enforceable, , *had Solid Host entered into to it*, and be applicable to its claims. Solid Host's opposition states: "For purposes of resolving the legal question of whether eNom's asserted 'limitation of liability' provisions apply here, plaintiff will assume, *arguendo*, that such provisions were in fact part of a click-agreement that plaintiff necessarily 'clicked on' a number of years ago when it initially registered its domain with eNom. However, should the Court conclude that such provisions, if they then existed, would be both enforceable and applicable herein, eNom would then have the burden (either at trial or on summary judgment) of proving their existence in any 'click-agreement' actually 'clicked on' by plaintiff."[36]

Solid Host thus requests that the court decide the legal issue raised by eNom, even though resolution of the question may ultimately prove to be unnecessary, and that it do so in a way that will definitively bind Solid Host only if the court rules in its favor. This the court cannot do. Because a factual dispute exists as to whether Solid Host agreed to the registration agreement, the court cannot consider the agreement on a motion for judgment on the pleadings.[37] See, e.g., *Horsley v. Feldt*, 304 F.3d 1125, 1134-35 (11th Cir. 2002) (holding that the "incorporation by reference" doctrine applies "for Rule 12(c) purposes to documents attached to answers just as it

---

[35]Plaintiff's Corrected Memorandum in Opposition to Motion for Judgment on the Pleadings by Defendants eNom and Demand Media ("Opp.") at 6. Solid Host concedes that acceptance of the agreement is presently a condition of registration by eNom, but disputes whether this was the case at the time it registered the <solidhost.com> domain name in 2004. (*Id.* at 6 n. 7.)

[36]*Id.* at 6 n. 7.

[37]For the same reason, it is not appropriate to convert eNom's motion into a motion for summary judgment.

applies for Rule 12(b)(6) purposes to documents attached to motions to dismiss. Otherwise, the conversion clause of Rule 12(c) would be too easily circumvented and disputed documents attached to an answer would have to be taken as true at the pleadings stage"). The court therefore denies eNom's motion to the extent it relies on the agreement attached to its answer. This denial is without prejudice to eNom's ability to assert the limitation on liability as a defense later in this litigation. Because eNom also contends that Solid Host cannot state a claim for violation of the CPA independent of the limitation on liability, the court next turns to that argument.

### C. Whether Solid Host States a Claim Against eNom for Violation of the CPA

To state a claim for violation of Washington's CPA, a plaintiff must allege (1) that the defendant committed an unfair or deceptive act; (2) that the act occurred in the conduct of trade or commerce; (3) that the act had an impact on the public interest; and (4) that the unfair or deceptive act caused injury to plaintiff's business or property. See *Northwest Strategies, Inc. v. Bucks Medical Services, Inc.* 927 F.Supp 1343, 1349 (W.D. Wash. 1996) (citing *Hangman Ridge Training Stables, Inc. v. Safeco Title Insurance Co.*, 105 Wash.2d 778, 780 (1986)); see also *Segal Co. (Eastern States), Inc. v. Amazon.com*, 280 F.Supp. 2d 1229, 1232 (W.D. Wash. 2003) ("In order to state a claim for relief under the CPA, plaintiffs must allege that acts by defendant were unfair or deceptive, occurred in the course of trade or commerce, affected the public interest, and caused injury to plaintiffs' business"); *Indoor Billboard/Washington, Inc. v. Integra Telecom of Washington, Inc.*, 162 Wash.2d 59, 73 (2007);("To prevail on a private CPA claim, a private plaintiff must show (1) an unfair or deceptive act or practice, (2) that occurs in trade or commerce, (3) a public interest, (4) injury to the plaintiff in his or her business or property, and (5) a causal link between the unfair or deceptive act and the injury suffered").

eNom argues that Solid Host's complaint does not allege that it committed an unfair or deceptive act.[38] "[F]or conduct to be an unfair or deceptive practice under the CPA, it must have the capacity to 'deceive a substantial portion of the public.'" *Segal*, 280 F.Supp.2d at 1232 (quoting *Sing v. John L. Scott, Inc.*, 134 Wash.2d 24, 30 (1997) (emphasis added in original));

---

[38] Mot. at 1.

11

see also *Holiday Resort Community Ass'n v. Echo Lake Associates, LLC*, 134 Wash.App. 210, 226 (2006) ("The first two elements may be established by showing that an unfair or deceptive act or practice has the capacity to deceive a substantial portion of the public and has occurred in the conduct of trade or commerce"); *Edmonds v. John L. Scott Real Estate, Inc.*, 87 Wash.App. 834, 845 (1997) ("An act or practice is unfair or deceptive for purposes of the CPA if it has the capacity to deceive a substantial portion of the public").[39] A plaintiff need not allege or show that the act was intended to deceive the public, however. See *Hangman Ridge*, 105 Wash.2d at 785 ("A plaintiff need not show that the act in question was *intended* to deceive, but [only] that the alleged act had the *capacity* to deceive a substantial portion of the public" (emphasis original); see also *Indoor Billboard*, 162 Wash.2d at 74-75 (quoting *Hangman Ridge*); *Sing*, 134 Wash.2d at 30 (same).

In the alternative, a plaintiff can satisfy this element by showing that defendant violated a statute, violation of which the Washington legislature has declared to be "an unfair or deceptive act in trade or commerce." *Hangman Ridge*, 105 Wash.2d at 785 ("The CPA, on its face, shows a carefully drafted attempt to bring within its reaches every person who conducts unfair or deceptive acts or practices in any trade or commerce. The above two elements may be established by a showing that (1) an act or practice which has a capacity to deceive a substantial portion of the public (2) has occurred in the conduct of any trade or commerce. Alternatively, these two elements may be established by a showing that the alleged act constitutes a per se unfair trade practice. A per se unfair trade practice exists when a statute which has been declared by the Legislature to constitute an unfair or deceptive act in trade or commerce has been violated"). Thus, an act that has not been classified as a "per se unfair trade practice" must be capable of deceiving the public to be actionable under the CPA; it is not enough that such an act be "unfair"

---

[39]Despite Solid Host's argument at the hearing that the language of the statute is disjunctive and that an "unfair" act need not have the capacity to deceive, this is not the interpretation that the Washington courts have placed on the provision. Rather, as the citations demonstrate, they have held that, like a deceptive act, an unfair act must have the capacity to deceive a substantial number of people.

12

in a general sense.

Solid Host argues that eNom's actions were "deceptive" because, once Doe obtained control of the <solidhost.com> domain name, he replaced Solid Host's website with a site stating that the domain name was for sale. Solid Host argues that because the new web page had the capacity to lead internet users accessing <solidhost.com> to believe that Solid Host was no longer doing business, eNom's actions were "deceptive" under the CPA. eNom did not create or maintain the allegedly deceptive web site at <solidhost.com>, however; Doe did. The complaint alleges that eNom failed to prevent Doe from stealing the domain name and thereafter refused to return control of it to Solid Host. These actions, by themselves, are not deceptive. Rather, the deception on which Solid Host relies stems from representations made by Doe using <solidhost.com> for allegedly fraudulent purposes.

An act that, by itself, does not have the capacity to deceive the public is not a "deceptive or unfair" act for purposes of the CPA. See *Stephens v. Omni Ins. Co.*, 138 Wash.App. 151, 182 (2007) ("[T]he practice of referring a subrogation interest to a debt collector does not *by itself* have the capacity to deceive a substantial portion of the public" (emphasis added)). This is because "implicit in th[e] term ['deceptive'] is 'the understanding that the actor *misrepresented* something of material importance.'" *Id.* at 166 (quoting *Hiner v. Bridgestone/Firestone, Inc.*, 91 Wash.App. 722, 730 (1998), rev'd on other grounds, 138 Wash.2d 248 (1999) (emphasis original)); see also *Holiday Resort Community Ass'n*, 134 Wash.App. at 226 ("Implicit in the definition of 'deceptive' under the CPA is the understanding that the practice misleads or misrepresents something of material importance"). Solid Host does not allege that eNom made any type of misrepresentation, that it was guilty of dishonesty or bad faith as respects the representations on the website, or that it knew Doe was misrepresenting facts on the website and breached a duty to disclose that fact to Solid Host. See, e.g., *Nguyen v. Doak Homes, Inc.*, 140 Wash.App. 726, 733-34 (2007) (home builder, who sold home to original owner, did not violate the CPA by failing to disclose defects in the home to a subsequent purchaser of the residence because it had no duty to disclose); *Koch v. Mutual of Enumclaw Ins. Co.*, 108 Wash.App. 500, 508 (2001) (holding that plaintiff had failed to establish that a physician who performed a medical

evaluation for an insurance company had violated the CPA because there was "no evidence supporting an inference of dishonesty or bad faith"); *Edmonds v. John L. Scott Real Estate, Inc.*, 87 Wash.App. 834, 847-48 (1997) (real estate agents who knew that sellers' representations on a property information form were false but failed to disclose this fact to purchasers when they gave them the form violated the CPA).

A case involving a newspaper sued under the CPA for running allegedly deceptive advertisements placed by a third party is instructive in this regard. In *Fidelity Mort. Corp. v. Seattle Times Co.*, 131 Wash.App. 462 (2005), the *Seattle Times* published a sampling of mortgage rates from various lenders each week in its Sunday edition. The rate chart constituted "paid avertising" by the lenders. *Id.* at 465-66.[40] The court held that the newspaper was not liable under the CPA, *inter alia*, because it had made no misrepresentations regarding the accuracy of the data in the chart, which was supplied by lenders who paid to have their information published. *Id.* at 469-70. Here, eNom stands in a position similar to that of the newspaper in *Fidelity Mortgage*. Although its actions as a registrar may have facilitated Doe's ability to misrepresent facts on the Solid Host website, Solid Host does not allege that eNom made affirmative misrepresentations of its own or engaged in any other form of deceptive conduct.

Although it has not briefed the issue, Solid Host may seek to hold eNom vicariously liable for Doe's action. For vicarious liability to lie under the CPA, "the right to control is indispensable." *Stephens*, 138 Wash.App. at 183. In *Stephens*, a Washington court held that a collection agency's practice of sending misleading notices to debtors could constitute a deceptive act under the CPA. *Id.* at 158. It concluded, however, that an insurance company that hired the agency to collect its debts could not be held vicariously liable under the CPA. *Id.* at 183. The court explained that because there was no evidence that the insurance company "controlled any aspect of notices sent by [the collection agency], there was no basis upon which to impose vicarious liability." *Id.*

---

[40]On a quarterly basis, the newspaper ran a rate chart that constituted a "news article." *Id.* at 466. The court held that this chart would not support a claim under the CPA because it was not published "in the conduct of any trade or commerce." *Id.* at 468.

Solid Host's complaint does not allege that eNom exercised any control over the content of the web site operated by Doe. Although eNom could have stopped Doe's misrepresentations by transferring the domain name back to Solid Host, this is an insufficient basis upon which to impose vicarious liability under the CPA. The insurance company in Stephens hired the collection agency to collect its debts; although it could, as a result, have stopped the agency from sending deceptive letters to its customers, the court found that this did not provide a sufficient basis for imposing vicarious liability under the CPA. Rather, *Stephens* held that vicarious liability under the CPA turns on the ability of the party to control the deceptive representation at issue. Because Solid Host's complaint contains no allegations that eNom exercised control over the content of <solidhost.com> at the time the deceptive representation occurred, it fails to state a claim against eNom for violation of the CPA.

Nor do the allegations in Solid Host's claim support a claim that eNom and Doe were joint tortfeasors. Generally, under Washington law, "a joint tort occurs only where the behavior of two or more tort-feasors is such as to make it proper to treat the conduct of each as the conduct of the others as well." *Elliot v. Barnes*, 32 Wash.App. 88, 90 (1982) (citing *Rauscher v. Halstead*, 16 Wash.App. 599, 601 (1976)). Three elements must exist to establish a joint tort: "(1) A concert of action; (2) a unity of purpose or design; [and] (3) two or more defendants working separately but to a common purpose and each acting with the knowledge and consent of the others." *Id.* at 91; see also *Stephens*, 138 Wash.App. at 182 ("Stephens argues that Omni and Credit were joint tortfeasors, but in this record there is no evidence of the collaboration or concerted action needed to establish that relationship," citing *Elliot*). There are no allegations in Solid Host's complaint that eNom and Doe shared a common purpose. Rather, the complaint alleges that eNom had inadequate security and failed to investigate the transfer of Solid Host's domain name. The gravamen of the complaint is that eNom failed to prevent Doe's scheme, not that eNom was an active participant in that scheme. Solid Host thus fails to state a claim against eNom as a joint tortfeasor as well.

## III. CONCLUSION

For the reasons stated, the court grants in part and denies in part eNom's motion for judgment on the pleadings. The court grants eNom's motion as to dismiss Solid Host's claim for violation of the Washington CPA, but affords Solid Host twenty days' leave to amend to plead a claim under the CPA consistent with this opinion. See *Doe v. United States*, 58 F.3d 494, 497 (9th Cir. 1995) ("'[A] district court should grant leave to amend . . . unless it determines that the pleading could not possibly be cured by the allegation of other facts,'" quoting *Cook, Perkiss & Liehe v. N. Cal. Collection Serv.*, 911 F.2d 242, 247 (9th Cir. 1990)). The court denies the balance of eNom's motion without prejudice to its right to renew its limitation of liability defense in a motion for summary judgment or at trial.

DATED: June 16 2009

　　　　　　　　　　　　　　　　　_/s/ Margaret M. Morrow_
　　　　　　　　　　　　　　　　　MARGARET M. MORROW
　　　　　　　　　　　　　　　　　UNITED STATES DISTRICT JUDGE